Melissa S. Hayward
  Texas Bar No. 24044908
  MHayward@FSLHlaw.Com
**FRANKLIN SKIERSKI LOVALL HAYWARD LLP**
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
TEL: (972) 755-7100
FAX: (972) 755-7110

PROPOSED COUNSEL FOR
DEBTORS

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** <br><br> **GC MERCHANDISE MART, LLC,** <br> Debtor. | § § § § § | Case No. 11-31563-BJH-11 <br> Chapter 11 |
| **In re:** <br><br> **DENVER MERCHANDISE MART, INC.** <br> Debtor. | § § § § § | Case No. 11-31615-SGJ-11 <br> Chapter 11 |
| **In re:** <br><br> **VALLEY CORPORATION,** <br> Debtor. | § § § § § | Case No. 11-31618-BJH-11 <br> Chapter 11 |
| **In re:** <br><br> **DENVER MERCHANDISE MART EMPLOYERS, INC.,** <br> Debtor. | § § § § § § | Case No. 11-31616-HDH-11 <br> Chapter 11 |
| **In re:** <br><br> **HAWTHORN LAKES ASSOCIATES, LTD.,** <br> Debtor. | § § § § § § | Case No. 11-31617-BJH-11 <br> Chapter 11 |

## MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE
## <u>DEBTOR TO USE CASH COLLATERAL</u>

**NO HEARING WILL BE CONDUCTED ON THIS MOTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS PLEADING WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION. IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT. IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING. IF YOU FAIL TO APPEAR AT THE HEARING, YOUR OBJECTION MAY BE STRICKEN. THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MATTER.**

**TO THE HONORABLE BARBARA J. HOUSER,
UNITED STATES BANKRUPTCY JUDGE:**

GC Merchandise Mart, LLC (the "Debtor") files this *Motion for Interim and Final Orders Authorizing the Debtor to Use Cash Collateral* (the "Motion") pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 507, 552, and FED. R. BANKR. P. 4001, and in support thereof respectfully represents to the Court as follows.

## I.
## JURISDICTION & VENUE

1.  This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This Motion constitutes a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 & 1409.

## II.
## BACKGROUND

2.  On March 1, 2011 (the "Petition Date"), Debtor GCMM filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), commencing its above-styled bankruptcy case. On March 3, 2011, DMM, Valley, DMME, and Hawthorn each filed their own respective petitions under chapter 11 of the Bankruptcy Code, commencing each of their own respective above-styled bankruptcy cases.

3. The Debtors continue to operate and manage their business as a "debtor in possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. No trustee or examiner has been appointed in the chapter 11 case (the "Chapter 11 Case") pursuant to section 1104 of the Bankruptcy Code.

5. The *Affidavit of John Doyle in Support of First Day Motions* (the "Affidavit") is being filed contemporaneously herewith and is incorporated herein.

**The Denver Merchandise Mart**

6. Taken together, the Debtors collectively operate the Denver Merchandise Mart (the "Mart"), which is the Rocky Mountain region's premier wholesale market center and a site for international, national and regional trade shows, consumer shows, and special events. The Mart has been operating successfully in Colorado for over 40 years and has established itself as one of the premiere Trade Centers in the United States, offering over 810,000 square feet of exposition space, meeting rooms, show rooms, retail stores, and restaurants. The Debtors and various affiliates have been operating the Mart since 1992.

7. The Mart is valued at more than forty ($40) million dollars and benefits from an operational platform that creates multiple revenue channels. Notwithstanding, most of the Mart's revenue comes from: (i) the rents it receives from its permanent tenant base; and (ii) the revenue it receives from both hosting and producing tradeshows and other events. Of the Mart's permanent tenants, nearly a quarter of them have been renting space at the Mart for more than 20 years as a result of the Gift Show and Western Shows, discussed below, and the average tenure of the Mart's tenant base is more than 12 years. Because it has long been recognized as a leader in the meeting and exhibition industry, the Mart maintains a substantial and loyal attendee base with respect to both the events that it regularly hosts and those that it actually produces.

**The Debtors' Operation of the Mart**

8. Each of the Debtors serves important roles and functions with regard to the operation of the Mart. By way of example, Debtor GCMM has owned the real estate upon which the Mart is situated since 1997,[1] and Debtor DMM has operated the Mart since 1992. Debtor DMME employs the Mart's approximately 120 employees, and Valley holds and maintains the Mart's liquor licenses.

9. Prior to the filing of the Bankruptcy Case, ABC Land & Development, Inc. ("ABC") acquired all of the capital stock of Debtor DMM and of ART Hawthorne, Inc. ("ART Hawthorne"), the managing general partner of Debtor Hawthorn, from EQK Holdings, Inc. ("EQK"), a subsidiary of American Realty Investors, Inc. ("ARI"), pursuant to a purchase agreement dated March 1, 2010. Prior to that time, EQK had acquired all of the capital stock of Debtor DMM and ART Hawthorne from American Realty Trust, Inc. ("ART"), also a subsidiary of ARI, pursuant to a purchase agreement dated December 31, 2010. EQK continues to hold a 99% class B limited partnership interest in Debtor Hawthorn, which owns 100% of the equity of Debtor GCMM.

10. ARI is a publically traded company that generally owns the stock of various corporate entities. In operating as the parent corporation over myriad other corporations, in the normal course of ARI's and its subsidiaries' business, the revenue from ARI's various subsidiaries flows upstream into a controlled operating account owned by ARI. From this account, ARI transfers funds to a separate controlled disbursement account owned by the particular subsidiary to pay such subsidiary's operating expenses each month.

---

[1] Prior to 1997, the real estate was owned by an entity called Garden Capital Merchandise Mart, Inc., also an affiliate of ARI.

11. Prior to ARI's and EQK's sale of all of the Debtor DMM's stock to ABC, the Debtor DMM's relationship with ARI worked exactly as described above, just like the rest of ARI's subsidiaries. Thus, each month, the Mart's revenue would flow upstream from Debtor DMM into ARI's controlled operating account, and the monthly operating expenses associated with the Mart would thereafter be paid from checks drawn from separate controlled disbursement accounts owned by Debtor DMM and funded by ARI. Other than Debtor DMM, none of the other Debtors owned any bank accounts, and Debtor DMM, as the entity operating the Mart, would pay each of the respective Debtors' monthly obligations through Debtor DMM's controlled disbursement accounts.

12. The Debtors have been operating the Mart in this fashion since 1992.

**The Debtors' Bankruptcy Filing and Berkadia.**

13. The Debtors' bankruptcy filing was an emergency filing precipitated by litigation commenced against Debtor GCMM by The Bank of New York Mellon as successor Trustee to JP Morgan Chase Bank (formally known as Chase Bank of Texas, NA) as Trustee for the Registered Holders of Commercial Capital Access One, Inc., Commercial Mortgage Bonds, Series 3 acting by and through its Special Servicer, Berkadia Commercial Mortgage LLC ("Berkadia"). Berkadia is an alleged secured creditor of Debtor GCMM and owns a mortgage interest in the real property upon which the Mart is situated. Specifically, as of the Petition Date, the Debtor GCMM was allegedly indebted to Berkadia as alleged successor-in-interest to Dynex Commercial, Inc. pursuant to a loan originally made to the Debtor by Dynex Commercial, Inc. on September 30, 1997 in the original principal amount of $30,000,000.00 (the "Loan"). The Loan is evidenced by, *inter alia*: (i) a Promissory Note dated September 30, 1997 in the original principal sum of Thirty Million and No/Dollars ($30,000,000.00) executed by Debtor GCMM and payable to Dynex Commercial, Inc.; and (ii) a Deed of Trust and Security Agreement by and

between the Debtor GCMM and Dynex Commercial, Inc. dated September 30, 1997 (collectively, the "Pre-Petition Loan Documents"). The Loan is allegedly secured by various instruments, including a deed of trust and UCC-1 financing statements, which were allegedly filed of record in appropriate jurisdictions. Collateral for the Loan allegedly includes substantially all of the assets of Debtor GCMM.

14. Berkadia has no relationship with any of the Debtors other than Debtor GCMM.

15. On March 1, 2011, Berkadia obtained an *ex parte* appointment of a receiver (the "Receiver") over the Mart in a Colorado proceeding (the "State Court Action"). Such Receiver was appointed without notice to any of the Debtors and in violation of applicable laws, procedures, and the Debtors' constitutional rights to due process. The Debtors were not served with any process prior to any hearing on the application for the Receiver, were not provided with notice of such hearing, and did not have an opportunity to be heard on such matter or defend against Berkadia's claims in violation of their due process rights under the United States Constitution. In sum, the appointment of a Receiver over the Mart's operations wrongfully interfered with the operations of the Debtors, including entities holding no relationship to Berkadia, adversely affected the Debtors' respective business activities, and generally caused the Debtors to suffer significant damages, including, but not limited to, damages related to the necessity of the bankruptcy filing as the only means of instantly insulating the operations of the Mart and Debtors from the destructive and wrongful interference by Receiver.

16. As such, in an effort to minimize the damages from an unanticipated, reckless, unconstitutional, and wrongful third party takeover of the Mart and its operations, and in order to fulfill the Mart's obligations to its existing customers and protect the continued operations of the

Mart, including critical ongoing negotiations for lease renewals and show contract extensions, the Debtors had no choice but to file for bankruptcy protection.

17. The Debtors hold substantial claims against Berkadia and the Receiver as a result of the above-described actions and intend to pursue such claims in the Bankruptcy Cases.

**Cash Collateral**

18. As noted above, Debtor DMM, as the entity operating the Mart, holds several deposit accounts (the "Accounts") which are used by the Debtor DMM to operate the Mart (the "Operational Costs").

19. The Debtors' only source of operating funds is generated by the operation of the Mart.

20. By virtue of the Pre-Petition Loan Documents referenced above, Berkadia asserts a first lien priority on all of Debtor GCMM's assets, alleged to include the Mart's revenue and the Accounts, which would constitute cash collateral pursuant to Section 363(a) of the Bankruptcy Code.

21. The Debtors require the use of Berkadia's alleged cash collateral to continue the operation of its business and will suffer irreparable and immediate harm if they are not granted the relief requested herein. An immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of the Mart, and without such funds, the Debtors will not be able to pay payroll and other direct operating expenses and obtain goods and services needed to carry on the Mart's business during this sensitive period in a manner that will avoid irreparable harm to the Debtors' estate. The Debtor's ability to use Berkadia's alleged Cash Collateral is vital to the confidence of the Mart's vendors and suppliers of the goods and services, to the Mart's tenants and clients, and to the preservation and maintenance of the going concern value of the Debtors' estates.

22. Pursuant to Section 363 of the Bankruptcy Code, the Debtors are requesting authority to use cash collateral to satisfy the Mart's normal and necessary operating expenses. A budget reflecting the projected normal and necessary costs for the month of March 2011 is attached hereto as Exhibit A. Absent the authority to use the amounts set forth in Exhibit A, the Debtors will be unable to operate and therefore successfully reorganize.

23. The Debtors submit that Berkadia's interests are adequately protected by Debtor GCMM's substantial equity in the real estate that is the Mart. Upon information and belief, as of Debtor GCMM's bankruptcy filing, the outstanding principal owed on the Loan was less than $22 million, whereas the value of the Mart is no less than $40 million. Further, the Mart is fully covered by commercial property and liability insurance. Notwithstanding the above, the Debtors will also provide Berkadia with a replacement lien on post-petition income to protect Berkadia to the extent of any diminution in value of its collateral.

24. The Debtors have not fully reviewed or evaluated the extent and validity of Berkadia's asserted liens and reserve the right to contest such liens, as well as assert other claims against Berkadia, as applicable.

WHEREFORE, BASED UPON THE FOREGOING, the Debtor requests that the Court grant the relief requested, authorize the Debtor's use of the cash collateral under the terms set forth herein, and grant the Debtor such other and further relief in law or in equity to which the Debtor may show itself justly entitled.

DATED: March 8, 2011.

Respectfully submitted,

**FRANKLIN SKIERSKI LOVALL HAYWARD LLP**

By: */s/ Melissa S. Hayward*
    Melissa S. Hayward
    Texas Bar No. 24044908
    MHayward@FSLHlaw.Com

10501 N. Central Expy., Suite 106
Dallas, Texas 75231
972.755.7100 (phone)
972.755.7110 (facsimile)

**PROPOSED COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF CONFERENCE

    The undersigned hereby certifies that she has communicated with Berkadia's attorneys, attached copies of the March budget, and requested authority to use cash collateral on an interim basis. As of this filing, Berkadia has not consented to the Debtor's usage of cash collateral, although the parties continue to work together in an effort to negotiate an acceptable order.

                                          */s/ Melissa S. Hayward*
                                          Melissa S. Hayward